1

2 **UNITED STATES DISTRICT COURT**

3 **NORTHERN DISTRICT OF CALIFORNIA**

4 **SAN JOSE DIVISION**

5

6 UNITED STATES OF AMERICA,          Case No.  17-cr-00603-BLF-2

7                Plaintiff,

8         v.                          **ORDER GRANTING IN PART MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, A NEW TRIAL**

9 DONALD OLGADO,

10                Defendant.          [Re:  ECF No. 395]

11

12         Before the Court is Defendant Donald Olgado's motion for judgment of acquittal or, in the

13 alternative, for a new trial.  ECF No. 395 ("Motion"); *see also* ECF No. 403 ("Reply").  The

14 Government opposes the Motion.  ECF No. 399 ("Opp.").  The Court held a hearing on the

15 Motion on November 10, 2021.  For the reasons stated on the record and laid out below, the Court

16 finds that the trial evidence was sufficient to permit a reasonable juror to find the essential

17 elements of the underlying counts of conviction on counts 4, 8, and 10 of the Indictment.  As to

18 counts 2–3, 5–7, 9, and 11–12 of the Indictment, however, the Court finds that there was

19 insufficient evidence for the jury to conclude that the trade secrets in those counts derived

20 independent economic value from their secrecy.  Accordingly, the motion for judgment of

21 acquittal is GRANTED as to counts 2–3, 5–7, 9, and 11–12, and DENIED as to counts 4, 8, and

22 10.  The Court CONDITIONALLY GRANTS the motion for a new trial as to counts 2–3, 5–7, 9,

23 and 11–12, and DENIES the motion for a new trial as to counts 4, 8, and 10.

24 **I.    BACKGROUND**

25         In the Indictment, the Government charged Defendant Donald Olgado and three

26 codefendants with one count of conspiracy to commit theft of trade secrets, 18 U.S.C.

27 § 1832(a)(5), and eleven counts of possession of stolen trade secrets and aiding and abetting such

28 theft and possession, 18 U.S.C. §§ 1832(a)(3) & 2.  ECF No. 1 ("Indictment") ¶¶ 11–20.  Olgado

United States District Court
Northern District of California

and his three codefendants were employees of Applied Materials, Inc., which supplied equipment, services, and software to enable the manufacturing of semiconductor chips for electronics, flat panel displays for computers, smartphones, and televisions, and solar products.  *Id.* ¶¶ 1–5.  The technology at issue in the Indictment supported the high-volume manufacturing of semiconductor wafers to be used in lighting and electronic devices, such as flatscreen televisions and smartphones.  *Id.* ¶ 6.  As described in the Indictment, Applied developed a multichamber, high-yield wafer capacity system for Metal Organic Chemical Vapor Deposition ("MOCVD"), a "highly complex process for growing crystalline layers by spraying different chemicals on wafers."  *Id.* ¶ 7.  The Government alleged that MOCVD technology involved multiple trade secrets, which Applied sought to protect by housing relevant materials in a confidential database called Teamcenter, which could only be accessed by authorized individuals.  The Indictment alleged that Olgado and his codefendants engaged in a conspiracy to steal Applied's technology and use it in a competing company called NVision.  *Id.* ¶ 13.  The conspiracy—charged in count 1 of the Indictment—allegedly lasted from September 2012 through approximately December 2012 and involved illegal possession of eleven specified Applied trade secrets in the form of CAD drawings, each one the foundation of one of counts 2–12 of the Indictment.  *Id.* ¶ 20.

A jury trial commenced on July 27, 2021 and lasted until the Government closed its rebuttal case on August 17, 2021.  At the close of the evidence, the Court granted motions for judgment of acquittal brought by two of Olgado's codefendants as to the eleven counts for aiding and abetting possession of stolen trade secrets; all other counts (including all counts against Olgado) proceeded to the jury.  The jury delivered its verdict on August 24, 2021.  As to Olgado, the jury hung on the count of conspiracy to commit theft of trade secrets and convicted him on the eleven counts of possession of stolen trade secrets.[1]  ECF No. 378.  This Motion followed, and the Court held a hearing on November 10, 2021.  *See* ECF No. 410 ("11/10/21 Hrg. Tr.").

---

[1] The Government dismissed the conspiracy count after the Court declared a mistrial on that count. ECF No. 386.  The jury acquitted Olgado's codefendant Liang Chen of counts 2–12 and acquitted Olgado's codefendants Wei-Yung Hsu and Robert Ewald of count 1.  ECF No. 378.

United States District Court
Northern District of California

## II.   MOTION FOR JUDGMENT OF ACQUITTAL

### A.   Legal Standard

Rule 29 of the Federal Rules of Criminal Procedure requires the Court, on a defendant's motion, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  The Court's review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307 (1979), which requires a court to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis original); *see also McDaniel v. Brown*, 558 U.S. 120 (2010) (reaffirming this standard); *accord United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc).  This rule establishes a two-step inquiry:

> First, a ... court must consider the evidence presented at trial in the light most favorable to the prosecution.... [And s]econd, after viewing the evidence in the light most favorable to the prosecution, the ... court must determine whether this evidence, so viewed, is adequate to allow "*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." This second step protects against rare occasions in which "a properly instructed jury may ... convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt[.]"

*Nevils*, 598 F.3d at 1164 (quoting *Jackson*, at 319) (emphasis in original).  If the court enters a judgment of acquittal after a guilty verdict, "the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29(d)(1).  The court must specify the reasons for that determination. *Id.*

### B.   Discussion

#### i.   Existence of a Trade Secret

A threshold issue, raised indirectly through the Parties' other arguments and the subject of extensive discussion at the hearing on the Motion, is whether the Government presented sufficient evidence for a rational juror to conclude that a trade secret existed for each of counts 2–12 of the Indictment.  Olgado argues that there was insufficient evidence to establish that a trade secret existed for each count, while the Government defends the sufficiency of the evidence for each

count through testimony of witnesses Brian Burrows and its expert Dr. Werner Goetz. 11/10/21 Hrg. Tr. at 64:15–65:23 (Government concession that only Burrows and Dr. Goetz testified as to the elements of a trade secret).

To establish that information is a trade secret, the Government must prove that (1) the information is actually secret because it is neither known to, nor readily ascertainable by, another person who can obtain economic value from the disclosure or use of the information; (2) the owner took reasonable measures to maintain that secrecy; and (3) independent economic value derived from that secrecy. 18 U.S.C. § 1839(3); *United States v. Chung*, 659 F.3d 815, 824–25 (9th Cir. 2011); *accord* ECF No. 372 ("Jury Inst.") No. 35.

The Government's concessions in responding to the Defendants' motions *in limine* guided the manner in which it elicited testimony to prove each of these elements. In response to Defendants' fifth motion *in limine*, the Government agreed that it could not and would not "ask [lay] witnesses to opine whether information is or is not a trade secret." ECF No. 291 at 15–16. The Court thus held that witnesses who worked at Applied could testify as to topics such as "whether certain technical information was treated as confidential; how Applied Materials stored CAD drawings and bills of material for the MOCVD tool in a secure confidential database; and how Applied Materials required employees not to share CAD drawings with third parties without a non-disclosure agreement." *Id.* (citing *GSI Tech., Inc. v. United Memories, Inc.*, 2015 WL 12942201, at *2 (N.D. Cal. Oct. 14, 2015)). The Government was also allowed to draw on Applied's engineers to establish the research and development time and expense devoted to developing the components of the MOCVD tool. These considerations fit neatly into the first two elements of a trade secret—that the information is actually secret and that Applied took reasonable measures to maintain that secrecy. *Chung*, 659 F.3d at 824–25. But the Court held (and the Government conceded) that testimony on the third element—whether independent economic value derived from information's secrecy—would require expert testimony. *Id.*

The Court finds that there is sufficient evidence for the first two elements as to each alleged trade secrets in counts 2–12. Brian Burrows—Applied's engineering manager for the Neon Group—first described Teamcenter, Applied's "data vault" that holds its CAD files. Trial

United States District Court
Northern District of California

4

United States District Court
Northern District of California

Tr. at 2175, 2178:19–25.  Burrows described how multiple sets of login information were needed to access Teamcenter, including a computer user name and password and a separate username and rotating RSA token number for Teamcenter itself.  *Id.* at 2179:11–23.  Burrows then identified the Teamcenter files that correspond to the trade secrets underlying each of counts 2–12, which he obtained from the DVDs that were seized by the FBI from Olgado and compared to files in Applied's Teamcenter.  For example, Burrows first described the "Gas Distribution Assembly Neon Showerhead" with Teamcenter ID TC1-0488531, the alleged trade secret referred to at trial as the "showerhead" that forms the foundation of count 4 in the Indictment.  *See id.* at 2186:19-2194:25; Indictment at 10.  Burrows testified about the function of the showerhead and that it took "a year and a half, maybe two years" to build.  *Id.* at 2187:24–2191:8; 2193:3–12.  Burrows further testified that the "Applied Materials Confidential" stamp would typically be shown on the document, but that it was likely missing because the file was obtained by a bulk export of "dumping a lot of the files to the hard drive at one time."  *Id.* at 2193:18–2194:25.  Finally, Burrows testified about the 3D portion of the Teamcenter file, which was shown to the jury via a video file depicting Burrows "manipulating the 3D model in the NX software."  *Id.* at 2195:1–2197:23.  Burrows provided similar testimony for each of the Teamcenter drawings underlying counts 2–3 and 5–12.  *Compare id.* at 2198:1–2203:5 (count 5); 2203:7–2206:23 (count 6); 2206:25–2209:4 (count 7); 2209:5–2214:4 (count 8); 2214:6–2217:11 (count 9); 2217:13–2220:2 (count 10); 2220:11–2222:6 (count 11); 2224:18–2230:25 (count 12); 2231:1–2234:23 (count 2); 2234:24–2237:7 (count 3); *with* Indictment at 10 (listing Teamcenter ID numbers for files underlying counts 2–3 and 5–12).

This testimony was sufficient for a rational juror to conclude that the first two elements of a trade secret were satisfied for each of the Teamcenter files underlying counts 2–12.  But because Burrows was testifying as a percipient witness and was not offered as an expert for the Government, he could not provide testimony about the independent economic value of the alleged trade secrets, consistent with the Government's concession in responding to Defendants' fifth motion *in limine*.  Accordingly, the Government needed to prove that element for each trade secret through its expert, Dr. Goetz.

United States District Court
Northern District of California

But Dr. Goetz did not testify as to the independent economic value of *each* of the trade secrets alleged in counts 2–12 of the Indictment.  Dr. Goetz did testify as to the independent economic value of the trade secrets asserted in certain counts.  He first testified as to the complex nature of a component of the showerhead, the trade secret alleged in count 4 of the Indictment.  Trial Tr. at 2555:4–2558:5 (describing the showerhead as a "very, very complex piece of equipment" that was a "tremendous achievement to design" and "difficult to manufacture consistently and reliably").  Dr. Goetz next testified to the value of the "carrier pallet"—the trade secret asserted in count 8—stating that although the carrier pallet was made of "commercial parts," Applied needed to have "a lot of know-how" to deliver gas to the chamber "in a very precise manner."  *Id.* at 2558:6–2561:11.  Finally, Dr. Goetz testified about the "hydride pallet"— charged in count 10—stating again that the design of the pallet needed to allow for the "abrupt and immediate" transfer of noxious ammonia gas into the MOCVD reactors.  *Id.* at 2561:12–2563:9. His testimony on the value of the trade secrets underlying counts 4, 8, and 10, in combination with Burrows' testimony on those same trade secrets, was sufficient for a rational juror to conclude that all of the elements of a trade secret were satisfied as to those counts.

But Dr. Goetz did not testify as to the specific alleged trade secrets underlying counts 2–3, 5–7, 9, or 11–12.  Indeed, the Government as good as admitted at trial that Dr. Goetz was not going to testify as to each of the alleged trade secrets.  *See* Trial Tr. at 2555:1–3 (stating that the Government was going to show Dr. Goetz "some of [the CAD drawings]—not all of them, but some of them").  Without any testimony from Dr. Goetz on the independent economic value of the alleged trade secrets in counts 2–3, 5–7, 9, or 11–12—and the Government's concession that he and Burrows were the only witnesses to testify to the trade secret elements underlying those counts—there was not sufficient evidence for a rational juror to conclude that the elements of a trade secret were satisfied for those counts.

Notably, Dr. Goetz testified about the "unique and significant" value of other MOCVD parts not charged in the Indictment.  He discussed the lower quartz dome, Trial Tr. at 2563:15; base plate for NLighten, *id.* at 2566:6–7; wafer carrier, *id.* at 2567:2; and support shaft, *id.* at 2569:18.  He further testified that the ability to access an entire set of drawings would have

6

1    substantial benefit to a competitor.  *Id.* at 2598:15–2599:3, 2667–668.  But Olgado was not

2    charged with theft of the entire compilation of CADs that made up the MCOVD tool and evidence

3    that the entire set of tens of thousands of CAD drawings derives economic value from its secrecy

4    is not evidence that any one of the 2D or 3D CAD drawings was a trade secret.

5         The focus of the Government's case against Olgado and his co-defendants was, perhaps

6    understandably, the conspiracy charge.  The jury found the Government did not prove that charge.

7    With its focus on a charge that did not require it to prove that any trade secrets were stolen or

8    misappropriated, *see* Jury Inst. No. 38, the Government simply failed to elicit the required

9    evidence as to the actual theft or misappropriation of the alleged trade secrets underlying these

10   counts.  Accordingly, a judgment of acquittal is appropriate on counts 2–3, 5–7, 9, and 11–12.

11   The remainder of this order considers the sufficiency of the evidence on counts 4, 8, and 10.

12             ii.    **2D vs. 3D CAD Drawings**

13        Another threshold issue in dispute is whether convictions could be sustained on evidence

14   regarding only the 3D CAD drawings.  Olgado argues that the Government "built its entire trade

15   secrets prosecution around Olgado's possession of 2D CAD drawings," and at several points in his

16   Motion contends that there is insufficient evidence to establish the elements of the crime based on

17   the 3D models alone.  Motion at 1, 5–7.  The Government responds that there was sufficient

18   evidence for a rational juror to convict Olgado of each count resting on "either 2D or 3D form[s]"

19   of the trade secrets, consistent with the Indictment and the Bill of Particulars identifying the trade

20   secrets for each of counts 2–12 as "a CAD drawing that 'can be viewed in two or three

21   dimensions.'"  Opp. at 2–3.  This issue is important because if the 3D drawings themselves could

22   provide sufficient evidence for a conviction, the possible grounds for acquittal are significantly

23   narrowed.  For example, because the Government and Olgado agree that Olgado "possessed" the

24   3D drawings even under Olgado's narrower definition of possession, *see infra* Section II.B.iv, the

25   Court need not evaluate arguments about the propriety of its instruction on "possession" or certain

26   arguments about Olgado's criminal intent if the Government presented the 3D models as separate

27   trade secrets.

28        After discussing the issue with the parties at the hearing, the Court concludes that the

Government did not try to elicit evidence that the purported trade secrets were separately shown in 2D and 3D forms.  Indeed, the Government conceded at the hearing that it "always had a consistent theory that these [trade secrets] were compilations"—that is, that the trade secret was a CAD drawing, which itself had 2D and 3D components.  This aligns with the Government's charging documents and witness testimony.  The Indictment lists the eleven Teamcenter Item IDs and Applied Part Nos. for each trade secret underlying counts 2–12.  *See* Indictment at 10.  The Bill of Particulars further specifies that each part number "can be viewed in two or three dimensions."  *E.g.*, ECF No. 146 at 2.  At trial, Burrows testified that a CAD drawing consists of both a 2D and a 3D drawing, Trial Tr. 2176:13–21, and Agent Burstein testified that the CAD drawings on Olgado's DVDs contained information for both 2D and 3D models, *id.* at 1769:10–1770:5.  Finally, in presenting its closing argument, the Government stated that "11 specific CAD drawings . . . are at the heart of the count[s]" and that its burden was to prove "that the CAD drawing alleged in each count is a trade secret."  *Id.* at 3710:3–7.  The Government presented the jury with a slide highlighting four of the counts, which included a table with "a corresponding 3D drawing for each 2D drawing for the charged counts."  *Id.* at 3736:18–19.  In each instance, the Government did not purport to separate out and separately identify the 2D and 3D components as *separate* trade secrets.  Instead, they were treated together as a single unit.

The Government consistently prosecuted this case under the theory that the CAD drawings—with their 2D and 3D parts—were trade secrets.  Indeed, the Government did not elicit testimony from Dr. Goetz that the 3D part of the CAD drawing derived independent economic value from being secret; Dr. Goetz's testimony instead combined the 2D and 3D parts of CAD drawings together.  The Court similarly cannot *post hoc* separate out the 2D and 3D parts of the CAD drawings in its analysis of whether a judgment of acquittal must be entered.  Thus, the issues regarding criminal intent and possession cannot be simplified only because there isn't a dispute about Olgado's access to the 3D component of the CAD drawings.  The Court proceeds to analyze each of Olgado's arguments for acquittal with that context in mind.

### iii.   Criminal Intent

Olgado's first argument in favor of a judgment of acquittal is that there was not sufficient

1   evidence that he possessed the required criminal intent to either convert trade secrets or to injure

2   Applied.  Motion at 3–9.  The Government responds by defending the sufficiency of the evidence

3   of Olgado's criminal intent in both regards.  Opp. at 4–10.

4                                    *a.  Intent to Convert Trade Secrets*

5           First, Olgado argues that no rational juror could have concluded that he intended to convert

6   trade secrets for the benefit of someone other than Applied.  Olgado argues that the evidence

7   shows that he purchased Solid Edge software that he knew would not permit him to access the 2D

8   CAD drawings, which were the drawings that had the level of detail that would allow someone to

9   duplicate an Applied part.  Motion at 3–7.  The Government responds that sufficient evidence

10  supports a jury finding that Olgado intended to convert trade secrets encompassed in both the 2D

11  and 3D CAD drawings.  The Government points to evidence that Olgado downloaded virtually all

12  of the design data for the MOCVD tool and began work on compressed time schedules, often

13  seeking to circumvent Applied's security policies.  Opp. at 4–8.

14          The Court agrees with the Government there was sufficient evidence for a rational juror to

15  conclude that Olgado intended to convert trade secrets.  First, a rational juror could have

16  concluded that Olgado sought to use the trade secrets to save time and effort in the new startup.

17  Olgado took approximately 98% of the design data for the MOCVD tool, which amounted to tens

18  of thousands of CAD drawings.  Trial Tr. at 2237:10–2239:25; 2249:24–2250:17.  These drawings

19  allowed Olgado to have a "stable base to start designing from" using the Solid Edge software that

20  could view the 3D part of the CAD drawings, TRX 145A, without paying the $6–8 million that

21  Dr. Chen had offered to Applied for the MOCVD IP.  Trial Tr. at 2955:2–2956:1.  This comports

22  with the evidence showing that Olgado was working under time constraints imposed by Dr. Chen

23  in getting drawings produced so the new startup could begin work quickly and manufacture a tool

24  within a year.  *See, e.g.*, TRX 94A ("Feel free to bother Donald on a preliminary layout to show

25  we are for real."); TRX 140D (agenda items: "What does the system look like (Donald, please

26  bring drawings)" and "MPQ/pGaN chamber 3D drawing (Donald, let's review the scale-up)");

27  *accord* TRX 123B (goal to have "[d]esigns complete and parts on order by end of February

28  [2013]"); TRX 131B (goal to have first system "built and ready for process testing by 9/30[/13]").

With these time constraints, a rational juror could conclude that Olgado sought to use Applied's drawings as a shortcut to produce drawings and eventually a tool for the startup.

Second, a rational juror could have concluded that Olgado intended to convert trade secrets based on the evidence showing that he skirted Applied's internal security to obtain the CAD drawings and then covered his tracks. While downloading thousands of CAD files, Olgado expressed concerns about "the paper trail and conflict of interest with [Applied]," stating that he "need[ed] to be careful" while downloading the files. TRX 102. Olgado said that it was "[v]ery painful" to get the materials off the system and that he "need[ed] to step up efforts to get this work done off the office system." TRX 102; TRX 109C. When Applied's security measures restricted Olgado from downloading CAD drawings to a USB device, Olgado said he needed to "get some hackers" to get around the restrictions. TRX 116B. When he succeeded, he called Applied "pathetic" and said "if anyone wants to pull stuff off, let me know." TRX 131A. Many of these emails were sent via personal email accounts instead of the ones administered by Applied. *Accord* TRX 107 (email from Dr. Chen suggesting use of personal email accounts). Finally, in a December 7, 2021 interview with Applied once the company became suspicious of his activity, Olgado was provided an "opportunity to explain some of the anomalies" the company observed, but he instead denied that he had taken any Applied confidential information using personal e-mail or removable storage devices. Trial Tr. at 2124:6–2125:8. From all of this evidence, a rational juror could conclude that Olgado intended to convert the trade secrets for use by the startup.

Olgado counters that there is insufficient evidence of his intent to convert trade secrets because the Solid Edge software he had could not read the 2D drawings. Motion at 3–4. His real intent, he maintained at trial, was to "test[]" the Solid Edge software with Applied's CAD drawings before purchasing it. Motion at 4–5. But as the Government points out, Olgado presented this defense at trial, and the jury rejected it. A rational juror could have instead chosen to credit the contrary evidence that supports the inference that Olgado intended to convert Applied's trade secrets for the startup's benefit and cover his tracks afterwards. Indeed, a rational juror could have concluded that the Solid Edge software was sufficient at that time for Olgado's use of the CAD drawings to form a "stable base to start designing from." TRX 145A. Only after

United States District Court
Northern District of California

1   fully utilizing the abilities of Solid Edge, a rational juror could conclude, did Olgado intend to

2   accept the limited 3-month free trial offer for NX so that he could access the 2D versions of the

3   drawings.  TRX 135 (dealer offer for "4 licenses + 1 free and he will give us the [Applied] 12K

4   version for free for three months"); TRX 136 (email receiving approval for purchase terms,

5   including the "3 months for free"); TRX 145A (Olgado describing difficulties with files and

6   saying that it was "always an option" to use NX "since the dealer said he would give [him] a

7   loaner license for 3 months," but that he "want[ed] to reserve this for later" and that NX could "be

8   2nd level clean up").

9         There was thus sufficient evidence of Olgado's intent to convert trade secrets.

10              *b.   Intent or Knowledge to Injure Applied*

11        Second, Olgado argues that there is insufficient evidence that he intended to injure

12   Applied; instead, Olgado says the evidence showed that Applied was exiting the MOCVD

13   business and abandoning the technology, negating any potential for harm.  Motion at 7–9.  The

14   Government responds that knowledge that his conduct would harm Applied confers liability under

15   the statute, regardless of Olgado's intent, and that there was sufficient evidence of Olgado's

16   knowledge.  Opp. at 8–9.

17        The Court agrees with the Government.  18 U.S.C. § 1832(a) states that someone who acts

18   "intending or knowing that the offense will [] injure any owner of that trade secret" may be guilty

19   of theft of trade secrets.  *Accord* Jury Inst. No. 40 ("knew or intended that his conduct would

20   injure the owner of the trade secret").  There was sufficient evidence for a rational juror to find

21   that Olgado knew that taking Applied's trade secrets would harm Applied.  Applied witnesses

22   testified that one reason that Dr. Chen's discussions with Applied about licensing the MOCVP IP

23   stalled was because Applied was worried that licensing the CAD drawings would "compromise

24   [its] other businesses."  Trial Tr. at 335:4–21; 393:19–394:7; *see also id.* at 548:3–22 ("[I]n the

25   scheme of a multi billion dollar[] corporation, that small amount of money and to risk having the

26   I.P. flow out of the company was not worth taking that risk."); TRX 1010 (email to Olgado

27   regarding Applied's rejection of the offer to license the MOCVD IP).  As a sophisticated engineer

28   at Applied who had worked on MOCVD for years, Olgado was aware of the IP's value and the

efforts that Applied took to protect it.  Olgado himself helped implement measures "to prevent unauthorized disclosure of company information," including CAD drawings, "to [those] who do not have a need to know."  TRX 315-3.  He was also required to complete an annual confidentiality training as an Applied employee.  Trial Tr. at 1614:21–1615:5.  And as discussed in the previous section, when Olgado encountered the security measures as he faced difficulties in bulk downloading the CAD files, he sought ways to bypass them and cover his tracks by using personal emails.  When he succeeded in evading security measures, he bragged about it, calling Applied "pathetic" and offering to others to "pull stuff off" the system.  TRX 131A.  As the Government states, the jury's acceptance of the Government's argument that loss of control of a trade secret would harm Applied is consistent with civil case law evaluating harm to companies from losing control of trade secrets.  *See, e.g.*, *AT&T Commc'ns of California v. Pac. Bell*, 1996 WL 940836, at *10 (N.D. Cal. July 3, 1996), *aff'd*, 108 F.3d 1384 (9th Cir. 1997) (loss of control of trade secrets was irreparable harm justifying injunctive relief).

Olgado makes two arguments in opposition, neither of which undermines the jury's verdict.  First, he argues that he knew Applied was exiting the MOCVD business, so he could not have intended or known that loss of control of the IP would harm Applied.  Reply at 3.  But that does not follow.  A rational juror could find that Applied still valued the MOCVD IP, even if it no longer sought to build its multi-chamber device.  Indeed, Splinter testified that there was the possibility that the IP could be used in the future within Applied, even if not in the multichamber device.  *See* Trial Tr. at 548:6–16.  Second, Olgado argues that because only the 2D drawings offered "useful information," and he did not have access to the 2D drawings, he could not have intended to harm Applied with material he did not have access to.  Reply at 2–3.  The Court rejects the premise of this argument below, which Olgado primarily raises in the context of "possession." But even accepting *arguendo* that Olgado could not be found to have had access to the 2D drawings, there was sufficient evidence for the jury to find that the 3D models did contain information that could be useful.  For example, Olgado's own expert Dr. David Breitstein recognized that 3D models contain a "great deal" of information and allow a user to manipulate the model to visualize the "organization and placement" of a part within a larger assembly.  Trial

Tr. at 3266:24–3267:16, 3268:11–3271:9, 3273:4–8.  A reasonable juror could conclude that Olgado intended to harm to Applied based on use of information in the 3D CAD drawings.[2]

A rational juror had sufficient evidence to conclude that Olgado intended to or knew he would injure Applied by converting its trade secrets.

### iv.    Possession of Trade Secrets

Olgado's next argument is that that there was insufficient evidence of his "possession" of Applied's trade secrets.  Olgado contends that "possession" requires "access" to the trade secrets, which he says he did not have because the Solid Edge software was incapable of viewing the 2D models that he claims were the crux of the Government's case.  Motion at 9–12.  Olgado states the Government thus failed to prove possession and that the jury instruction on possession was similarly erroneous.  *Id.* at 12–14.  The Government says that the case law does not require "access" for "possession," thus defending the sufficiency of the evidence of possession and the corresponding jury instruction.  Opp. at 10–11.[3]

This dispute was the subject of extensive briefing and argument before and throughout the

---

[2] This issue—whether Olgado could not have intended to harm Applied because the 3D models that he had access to supposedly did not contain "useful information"—is separate from the issue of whether the 3D models independently derived economic value from their secrecy.  The Court has already concluded that the Government did not offer any expert testimony establishing the independent economic value of the 3D models themselves such that they were trade secrets, but that does not mean that a reasonable juror could not conclude that Olgado intended to harm Applied based on evidence that the 3D models contained at least some information of value.

[3] Because the Court has already concluded that the Government did not try this case by alleging that the 2D and 3D CAD drawings were separate trade secrets, the threshold issue presented by the parties—whether Olgado's undisputed access to the 3D CAD drawings can alone sustain the jury's verdict—does not resolve the possession issue.  *See supra* Section II.B.ii.  Because the CAD drawings alleged as trade secrets included both the 2D and 3D models as a single unit, the Court must grapple with the parties' arguments regarding possession.

United States District Court
Northern District of California

1  trial.  Before trial, the parties debated the proper instruction for the definition of "possession."  *See*

2  ECF No. 271 at 52.  The Government proposed using Ninth Circuit Model Criminal Jury

3  Instruction 3.15, which states:  "A person has possession of something if the person knows of its

4  presence and has physical control of it, or knows of its presence and has the power and intention to

5  control it."  *Id.*  Defendants argued that this instruction was inadequate because this case involves

6  electronically stored information and "there is a factual question whether the computer user can

7  access/view or manipulate the ESI."  *Id.*  Thus, Defendants proposed adding the following

8  language to the model instruction:

> Possession of a trade secret that consists of electronic information
> requires proof that the person had knowledge of and access to the
> particular electronic information.  Access to information is the
> capability to read, manipulate or utilize the electronic information.

12  *Id.* (citing *United States v. Flyer*, 633 F.3d 911, 919 (9th Cir. 2011)).  The Court requested

13  additional briefing on this issue, which the parties provided, and later held argument during a

14  morning before trial proceedings.  ECF Nos. 349, 363; Trial Tr. at 2924:12–2937:1.  Ultimately,

15  the Court declined to modify the model instruction, but stated that defendants' positions were

16  "appropriate arguments for the jury" because they were "well within the []ambit[4] of [the]

17  instruction."  Trial Tr. at 2936:5–7; *accord* Jury Inst. No. 43 (instruction as read to the jury).

18  Indeed, Olgado argued to the jury that he could not have possessed the trade secrets because he

19  "selected the software that did not allow him to access, read, or do anything with the 2D

20  blueprints."  Trial Tr. at 3805:6–7; *see also id.* at 3805:8–18; 3809:21–3811:1; 3823:20–3824:9.

21  The jury evidently rejected that argument when it convicted Olgado.

22      Now readdressing the issue post-verdict, the Court reaffirms its prior ruling and the

23  propriety of the jury instruction and finds that there was sufficient evidence for a rational juror to

24  conclude that Olgado possessed the trade secrets.

25      To be found guilty of unlawful possession of trade secrets in violation of 18 U.S.C.

26  § 1832(a)(3), a person must "knowingly . . . receive[], buy[], or possess[]" the trade secret.

---

28  [4] The Court has corrected a typographical error in the transcript to replace "gambit" with "ambit."

United States District Court
Northern District of California

Because "possession" is undefined by the statue, the word is to be given "its plain meaning" and courts are to "presume Congress intended to apply traditional concepts of possession." *United States v. Romm*, 455 F.3d 990, 999 (9th Cir. 2006) (interpreting term "knowing possession" in 18 U.S.C. § 2252A) (citing *United States v. Mohrbacher*, 182 F.3d 1041, 1048–49 (9th Cir. 1999)). "'Possession' is '[t]he fact or having or holding property in one's power; the exercise of dominion over property.'" *Flyer*, 633 F.3d at 918 (quoting Black's Law Dictionary (7th ed. 1999)). Accordingly, "[t]o establish possession, the government must prove a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over [it]." *Id.* (citing *Romm*, 455 F.3d at 999).

Courts in this circuit and others have wrestled with the concept of possession and the meaning of "dominion and control" over contraband (although largely in the context of child pornography). After examining the cases cited by the parties, the Court concludes that there is no *sine qua non* of possession under the case law. Instead, courts have looked to several traditional indicators of dominion and control over an object. For example, in *Romm*, the Ninth Circuit affirmed a conviction for possession of child pornography where expert testimony established that the defendant could "print the images, enlarge them, copy them, or email them to others" or "destroy the copy of the images that his browser stored to his cache." 455 F.3d at 1000–01. Other cases similarly hold that defendants can "possess" contraband in a number of different ways. *See, e.g.*, *United States v. Carpegna*, 2013 WL 4442036 (D. Mont. Aug. 14, 2013), *aff'd*, 608 F. App'x 508 (9th Cir. 2015) (possession where defendant could print, download, or save images); *AVX Corp. v. Kim*, 2017 WL 11316598, at *1–3 (D.S.C. Mar. 13, 2017) (possession where defendant was "downloading and copying" computer files).

Contrary to Olgado's contention, the cases overturning convictions for possession of child pornography do not establish that "access" is a necessary condition of "possession." Instead, these cases are better characterized as holding that conviction for *knowing* possession of child pornography is impermissible based on images that reside in unallocated cache files on a computer because a defendant may not *know* that they reside there. For example, the conviction in *Flyer* was based on the presence of images in "unallocated space" on a computer hard drive, which

United States District Court
Northern District of California

"cannot be seen or accessed by the user without the use of forensic software."  633 F.3d at 918.

The Court found the conviction could not stand because the government "concede[d] that it

presented no evidence that Flyer knew of the presence of the files on the unallocated space of his

Gateway computer's hard drive."  *Id.* at 919.  The court reasoned that allowing a conviction on

this basis would "turn[] abysmal ignorance into knowledge and a less than valetudinarian grasp

into dominion and control."  *Id.* at 920 (quoting *United States v. Kuchinski*, 469 F.3d 853, 863 (9th

Cir. 2006)).  Other cases in this area similarly turn on the defendant's lack of knowledge of the

existence of the files in unallocated space and inability to take any action as to those files.  *See,*

*e.g.*, *United States v. Moreland*, 665 F.3d 137, 148 (5th Cir. 2011) (lack of evidence that defendant

"had knowledge that the images were in the computers"); *United States v. Navrestad*, 66 M.J. 262,

264–267 (C.A.A.F. 2008) (lack of evidence that pornographic images viewed at internet café

could be "e-mailed, printed[,] or purchased" by defendant or that defendant "was even aware that

he could take any of these actions").

　　　　The Ninth Circuit Model Instruction on possession accurately reflects this legal landscape.

The instruction allows a finding of possession of something if the person "knows of its presence"

and has either "physical control of it" or "the power and intention to control it."  Jury Inst. No. 43.

This language is similar to the "dominion and control" language used by the Ninth Circuit in case

law and allows the jury to evaluate the issue by applying "traditional concepts of possession."

*Romm*, 455 F.3d at 999.  Indeed, the comment to the instruction indicates that the instruction is

"all-inclusive" and that "there is no need to attempt to distinguish further between [issues such as]

actual and constructive possession and sole and joint possession."  Based on this instruction, the

jury was free to accept Olgado's argument that because he could not access the 2D drawings using

the Solid Edge software, he did not have the "power and intention" to control the trade secrets.

The jury was also free to—and did—reject that argument as inconsistent with common sense

"traditional concepts" of possession.

　　　　Properly presented with the model instruction, a rational juror had sufficient evidence to

conclude that Olgado had possession of the trade secrets.  There is no dispute that Olgado

downloaded tens of thousands of CAD files, including the CAD files underlying counts 4, 8, and

16

United States District Court
Northern District of California

10 of the Indictment.  Trial Tr. at 2237:10–2239:25, 2249:24–2250:17 (Olgado downloaded virtually all of the data for the MOCVD tool).  Olgado performed a bulk download of these files from Teamcenter to a personal USB device and DVDs, encountering security restrictions along the way.  TRX 116B.  It is also undisputed that Olgado had the ability to transfer, delete, or send the CAD files that he downloaded—and that he did so when he created the DVDs.  Trial Tr. at 3257:2–17 (Olgado's expert agreeing that Olgado could save, e-mail, delete, or copy the CAD files); TRX 2 (DVDs containing the CAD files).  This was sufficient evidence for a rational juror to conclude that Olgado had "dominion and control" over the CAD files.  *Romm*, 455 F.3d at 999.

That resolves the issue.  But even if access was a necessary condition of possession, there was also sufficient evidence for a rational juror to conclude that Olgado had the ability to access the 2D images.  Included in his purchase of the Solid Edge software was a limited 3-month free trial offer for NX, which was capable of viewing the 2D CAD drawings that could not be opened in Solid Edge.  TRX 135 (dealer offer for "4 licenses + 1 free and he will give us the [Applied] 12K version for free for three months"); TRX 136 (email receiving approval for purchase terms, including the "3 months for free").  Contrary to his arguments otherwise, Olgado's ability to use NX is not "speculation."  Motion at 10.  Olgado stated that NX was "always an option" for opening the CAD files after obtaining a "stable base to start designing from" using the Solid Edge software, but that he "want[ed] to reserve this for later" and that NX could "be 2nd level clean up."  TRX 145A.  A rational juror therefore could have concluded that Olgado had "access" to the 2D CAD drawings by merely activating his free trial of NX and opening the CAD files in that program.[5]

_____

[5] Olgado's reliance on the non-precedential *United States v. Combs*, 510 F. App'x 668 (9th Cir. 2013), is misplaced.  In that unpublished case, the Ninth Circuit found insufficient evidence for a jury to conclude the defendant possessed a semiautomatic rifle.  Although defendant knew of the weapon, it was owned by another person, who kept it in a locked case inside a locked storage unit to which only she (and not the defendant) had keys.  *Id.* at 671.  Here, Olgado himself had the rights to a free trial of NX.  The only action needed to "access" the 2D CAD drawings—activating

17

1    For those reasons, there was sufficient evidence for a rational juror to find that Olgado had

2    possession of the trade secrets.

3        **v.    Reasonable Measures to Protect Trade Secrets**

4    Olgado additionally argues that no rational juror could conclude that Applied took

5    "reasonable measures" to protect its trade secrets.  Olgado says that the Government offered

6    insufficient evidence that Applied took "reasonable measures" because the evidence showed that

7    employees inconsistently followed Applied's protocols or outright flouted them.  Motion at 19–20.

8    These policies were "a far cry" from the type of "need to know" access that constitute reasonable

9    measures, Olgado says.  *Id.* at 20–21.  The Government responds that "absolute secrecy is not

10   required," and that there was sufficient evidence for the jury to conclude that Applied's

11   confidentiality measures were reasonable.  Opp. at 19–20.

12   The Court agrees with the Government that there was sufficient evidence that Applied took

13   reasonable measures to protect its trade secrets.  For example, Applied stored its CAD drawings in

14   Teamcenter, which could only be accessed after a user entered a computer user name and

15   password, a separate Teamcenter username, and a separate RSA token key.  Trial Tr. at 2153:9–

16   18; 2010:15–2011:10; 2025:15–23; TRX 215.  Applied employee agreements, separation

17   documents, and exit interviews all included confidentiality language and admonitions.  *E.g.*, TRX

18   254-99; TRX 561.  Applied had policy statements on protection of confidential information and

19   trade secrets and required employees to attend periodic trainings on the same.  TRX 68-7 to 68-10;

20   TRX 453; TRX 454-5; Trial Tr. at 2057:8–16.  It used non-disclosure agreements with suppliers

21   who handled CAD drawings.  Trial Tr. at 1936:17–1937:1; TRX 85-32.  Applied's facilities had

22   badge-restricted access. Trial Tr. at 2006:9–2007:2.  And Applied's systems had software and

23   policies that were designed to monitor and block transfers of CAD drawings and other confidential

24   information—measures that Olgado himself encountered and evaded.  Trial Tr. at 2007:24–

25   2008:21; TRX 116B; TRX 119; TRX 145A.  These measures are well in line with those in other

26   cases where courts and juries have found "reasonable measures" were used to protect trade secrets.

27   _____

28   his free trial of NX—was one that Olgado himself could take.

United States District Court
Northern District of California

United States District Court
Northern District of California

*See, e.g.*, *Chung*, 659 F.3d at 825–26, 827 (reasonable measures where security guards ensured access control, employees attended training sessions on confidentiality, and employees signed confidentiality agreements, among other measures); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (reasonable measures where company required employees to sign confidentiality agreements).

Olgado points to—in the Government's words—"some gaps" in Applied's treatment of its trade secret materials. Opp. at 21. There is assuredly evidence of gaps. For example, MOCVD project blueprints were sometimes left out in Applied facilities and in vendor offices overnight, and Applied granted Teamcenter access widely within the company even to employees who arguably did not have "need to know." *E.g.*, Trial Tr. at 1393:2–1396:25; 642:1–643:3. But as the Government says, it is only "reasonable measures" that are required, and the evidence cited above is more than sufficient for a jury to conclude that Applied took "reasonable measures" to protect its trade secrets. *See United States v. Jin*, 833 F. Supp. 2d 977, 1008–09 (N.D. Ill. 2012), *aff'd*, 733 F.3d 718 (7th Cir. 2013) ("[T]hat there were other precautions Motorola could have taken does not mean that the measures it did take were not reasonable.") (citing *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 180 (7th Cir. 1991)). A judgment of acquittal is thus not warranted on this ground.

### vi.    Actions Taken "Without Authorization"

Olgado's final argument is that the Government's failed to prove that he acted "without authorization" when he downloaded Applied's CAD files. Motion at 16–18. Olgado says that he was authorized to access—"read, review, print, edit"—Teamcenter files before December 7, 2012 and made no unauthorized use of them during that time. *Id.* Due to his lack of use, he says the Government has impermissibly expanded the meaning of "without authorization" to include his alleged "intent to use them 'for his personal benefit.'" *Id.* at 17 (quoting Trial Tr. at 3718:10–14). Olgado argues that this would criminalize common practices, such as an employee accessing his employer's files to refresh his memory of work he had done in preparation for a job interview with another company. *Id.* Olgado says that because "without authorization" is ambiguous, the rule of lenity counsels against the Government's expansive interpretation. *Id.* at 18.

The Government contests Olgado's interpretation of the statute, saying that a rational jury was only required to find that Olgado "knowingly received or possessed the trade secret . . . knowing the same to have been stolen or appropriated without authorization, obtained without authorization, or converted without authorization."  Opp. at 15 (citing Jury Inst. No. 40).  The Government says that the proper inquiry is whether Olgado had authorization not only to access the CAD files, but also whether he had authorization to appropriate, keep, or use the files for an unauthorized purpose.  *Id.* at 16, 18–19.  With that standard in mind, the Government defends the sufficiency of the evidence, pointing to his bulk download of CAD files without proper confidentiality labeling, evasion of the prohibition on removable storage, and intent to use the CAD drawings for the startup.  *Id.* at 17–18.  The Government also contests Olgado's analogy to cases under the Computer Fraud and Abuse Act ("CFAA") because of the differing scope of that statute.  *Id.*

18 U.S.C. § 1832(a)(3) criminalizes knowingly receiving, buying, or possessing trade secrets "knowing the same to have been stolen or appropriated, obtained, or converted without authorization."  The statute does not define "without authorization," so once again the Court must assign it its "ordinary, contemporary, common meaning."  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009) (interpreting the same phrase in the CFAA).  The phrase "without authorization" is "not foreign to Congress or the courts:  the terms 'authorize,' 'authorized' or 'authorization' are used without definition over 400 times in Title 18."  *United States v. Nosal*, 844 F.3d 1024, 1035 (9th Cir. 2016).  In light of this widespread usage, the Court has no trouble concluding that "without authorization" has the same "ordinary, contemporary, common meaning" the Ninth Circuit has found that it has in the context of the CFAA:  without "permission or power granted by an authority."  *Id.* at 1033 (citing *Brekka*, 581 F.3d at 1133).  Because the meaning of the term is not ambiguous, the rule of lenity is not implicated.

Neither party really disputes the meaning of the phrase "without authorization."  The parties' actual dispute here is instead what action or actions taken "without authorization" are criminalized by § 1832(a)(3).  The statute provides an answer:  the defendant must know the trade secrets to have been "appropriated, obtained, or converted without authorization."  18 U.S.C.

§ 1832(a)(3).  The question then becomes the meanings of "appropriated without authorization," "obtained without authorization," and "converted without authorization," and whether the Government presented sufficient evidence of Olgado taking any of those actions.  *Accord* Jury Inst. No. 40 (instructing the jury with these separate phrases).

For this reason, the Court finds less instructive cases involving other unauthorized actions taken under the CFAA.  That statute focuses on forms of unauthorized *access*.  18 U.S.C. § 1030(a)(2) (someone who "intentionally accesses a computer without authorization or exceeds authorized access); *accord Van Buren v. United States*, 141 S. Ct. 1648, 1658–59, 1662 (2021) (interpreting the phrases "accesses a computer without authorization" and "exceeds authorized access" in the CFAA).  The term "access without authorization" does not appear in § 1832(a)(3), and the Government properly argues that absence of proof that Olgado was not authorized to access the trade secrets is not dispositive.  Misappropriation is broader than conduct proscribed under the CFAA.  *See United States v. Nosal*, 676 F.3d 854, 857 & n.3 (9th Cir. 2012) (recognizing that § 1832 criminalizes a broader set of behavior than the CFAA due to use of "common law terms for misappropriation," like steals, appropriates, and takes); *United States v. Nosal*, 844 F.3d 1024, 1035 (9th Cir. 2016) (same).

In defense of the verdict, the Government lumps the three actions together without differentiating between them.  *See* Opp. at 17–18.  The Court, however, will look at each action— "obtained," "appropriated," and "converted"—in turn to determine if there was sufficient evidence to sustain a conviction for the trade secrets underlying counts 4, 8, and 10.

> ### a.   *"Obtained Without Authorization" and "Appropriated Without Authorization"*

The first two actions impermissible under § 1832(a)(3) are possessing trade secrets the person knows to be "obtained without authorization" or "appropriated without authorization."  Neither term is defined in the statute, so the Court gives them their ordinary meaning.  Obtain means "to bring into one's own possession."  Obtain, Black's Law Dictionary (11th ed. 2019). "Appropriate" means "to take exclusive possession of," "to set apart for or assign to a particular purpose or use," or "to take or make use of without authority or right."  Appropriate, Merriam-

1    Webster (11th ed. 2020).

2         The Government argues that Olgado's bulk download of tens of thousands of CAD

3    drawings from Teamcenter without confidentiality labeling and storage of those drawings off the

4    Applied network onto USBs and DVDs is evidence that he acted "without authorization."  *See*

5    Opp. at 17–18 (quoting *United States v. Zhang*, 590 F. App'x 663, 666 (9th Cir. 2014)).  But as

6    Olgado points out in his reply, he downloaded the CAD files while he was an Applied employee

7    who was granted access to Teamcenter.  Olgado's bulk download of CAD files without a

8    confidentiality label and storage on DVDs may not have complied with Applied's policies for

9    handling trade secrets, but that does not mean that he was not authorized to download the trade

10   secrets.  Olgado was either authorized to obtain trade secrets, or he was not.  Because he was

11   employed at Applied and had access to Teamcenter at the time he downloaded the CAD files,

12   Olgado had authorization to download the CAD drawings at that time.  It was not until December

13   7, 2012—after Olgado's interview with Applied attorneys—that Applied determined that he

14   should no longer be authorized to obtain materials from Teamcenter.  Trial Tr. at 2121:24–2122:2,

15   2129:13–19.  The evidence showed that Olgado downloaded the CAD files underlying counts 4, 8,

16   and 10 before that date, and the Government did not offer evidence that Olgado made use of the

17   trade secrets after Applied withdrew Olgado's authorization to access Teamcenter and the CAD

18   files within.

19        Nor is the "volume and timing" of Olgado's downloads evidence that he obtained or

20   appropriated the CAD files without authorization.  *Contra* Opp. at 17 (citing *Zhang*, 590 F. App'x

21   at 666).  Setting aside that Olgado was authorized to download the files as an Applied employee

22   with Teamcenter access, Olgado was "famous" for downloading and archiving Applied files under

23   the company's "Applied Anywhere" policy.  Trial Tr. at 2984:1–2985:7, 2879:4–14.  That is

24   unlike *Zhang*, in which the defendant's work "never before required him" to download any work

25   at the company.  590 F. App'x at 666.  Olgado's download of the CAD files thus does not create

26   the "highly suspicious" inference of lack of authorization that the downloads in *Zhang* did.

27        Because Olgado downloaded the trade secrets during his employment at Applied when he

28   was authorized to do so, there was not sufficient evidence that Olgado "obtained" or

United States District Court
Northern District of California

1    "appropriated" Applied trade secrets "without authorization."

2                    b.   *"Converted Without Authorization"*

3        The third action prohibited by § 1832(a)(3) is possessing trade secrets the person knows to

4    have been "converted without authorization."  The term "converted" is not defined in the statute

5    but evokes the common law tort of conversion—the "willful interference . . . with an item of

6    property in a manner inconsistent with another's right, whereby the other person is deprived of the

7    use and possession of the property."  Conversion, Black's Law Dictionary (11th ed. 2019); *see*

8    *also Nosal*, 676 F.3d at 857 n.3 (noting that § 1832 uses "common law terms" such as "convert" to

9    describe prohibited actions).

10       At common law, a person can commit conversion in multiple ways, including by

11   unlawfully retaining possession of information lawfully acquired or refusing to give up another's

12   property upon demand by that entity.  *See, e.g.*, Restatement (Second) of Torts § 237 (1965) ("One

13   in possession of a chattel . . . who, on demand, refuses without proper qualification to surrender it

14   to another entitled to its immediate possession, is subject to liability for its conversion."); *cf., e.g.*,

15   *Nicholson v. McDonald*, 193 Cal. App. 2d 675, 680 (1961) (defendant had "no legal right to retain

16   the property in his possession, and therefore his refusal to give up possession on [plaintiff's

17   demand] amounted to conversion").  This is regardless of whether the original acquisition of the

18   information was lawful.  *See* Restatement (Second) of Torts § 237 cmt. e (1965) ("The conversion

19   consists in the unlawful detention of the chattel, and not in the manner in which possession was

20   originally acquired.").

21       Although the Government does not specifically use the term "conversion," it does cite to

22   sufficient evidence for a rational juror to conclude that Olgado "converted" the trade secrets

23   without authorization within the common law meaning of that term.  In his December 7, 2012

24   interview with Olgado, Applied employee Stephen Adams—who served as an attorney in the law

25   department and in the Confidential Asset Management Group, Trial Tr. at 2111:14–17—asked

26   Olgado if he had "extracted Applied Confidential Information in any way to his home control,"

27   including "USB devices [and] cloud storage."  Trial Tr. at 2124:20–24.  In order to conceal the

28   CAD drawings he downloaded, Olgado lied to Adams, untruthfully telling him that other than

United States District Court
Northern District of California

"medical things [and] tax things" and some isolated photographs of drawings, he had not taken Applied confidential information to his home control. *Id.* at 2124:25–2125:8.  At the conclusion of the interview, Adams told Olgado that it was "inappropriate for him to continue to be allowed to have access to Applied's data and systems" and to "go home and . . . not conduct any work-related activity." *Id.* at 2129:12–2130:2.  Adams' failure to expressly demand return of Applied confidential information was only due to Olgado's dishonest response that he didn't have any such information.  The lack of express demand in the face of dishonesty about possession does not preclude liability for conversion.  *See* Restatement (Second) of Torts § 237 cmt. g (1965) ("[A] denial that the defendant has the chattel . . . may be enough to amount to a refusal.  Such questions are frequently for the jury.").  Ample evidence supported the subsumed conclusion of the jury that Olgado refused to return Applied's documents.

Accordingly, even if Olgado had lawfully "obtained" the CAD drawings as an employee, he was clearly on notice by December 7, 2012 that continued possession of Applied's MOCVD files was not authorized.  But Olgado did not return the DVDs containing the CAD drawings until almost two weeks later[6] after Applied filed for a temporary restraining order; he then stipulated to do so.  TRX 3 (letter between counsel indicating exchange of Applied materials pursuant to stipulated TRO); TRX 187 (stipulated TRO).  Olgado unlawfully retained possession of information after Applied withdrew his authorization to have it, which amounted to a constructive refusal to give up Applied's property upon demand.  There was thus sufficient evidence for a rational juror to conclude that Olgado "converted" the trade secrets "without authorization."

_____

[6] A rational juror could have concluded that this amount of time was not too "trivial and unimportant" to counsel against finding conversion.  *See* Restatement (Second) of Torts § 237 cmt. a (1965) ("There may be trivial and unimportant detentions of chattels which are not so serious as to amount to a conversion.").  Moreover, the DVDs were returned only after a civil lawsuit for misappropriation was filed against him.

III.    **MOTION FOR A NEW TRIAL**

A.    **Legal Standard**

On issues for which the Court has granted a motion for judgment of acquittal following a guilty verdict, "the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29(d)(1). The court must specify the reasons for that determination. *Id.*

Olgado separately seeks a new trial on several issues. "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Ninth Circuit described the standard for granting a new trial in *United States v. Alston*, 974 F.2d 1206 (9th Cir. 1992), which it reaffirmed in *United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000):

> [A] district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal. The court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses . . . If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*Kellington*, 217 F.3d at 1097 (internal quotation marks and citations omitted). The court may also consider evidentiary and procedural errors in weighing the motion for new trial. *See, e.g.*, *United States v. Tory*, 52 F.3d 207, 211 (9th Cir. 1995) (new trial granted in light of four erroneous evidentiary rulings).

B.    **Discussion**

Olgado specifically requests a new trial based on three of his arguments. *See* Motion at 14 (possession), 16–19 (without authorization), 25 (variance in proof of independent economic value). Nevertheless, because he also asks for a new trial due to the "cumulative effect of the[] errors" specified in his motion, the Court evaluates his request wholistically to determine if the "evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred," notwithstanding "the abstract sufficiency of the verdict." *Kellington*,

United States District Court
Northern District of California

217 F.3d at 1097.

The Court will evaluate the necessity of a new trial separately for (1) counts 2–3, 5–7, 9, and 11–12, for which it has granted the motion for judgment of acquittal; and (2) counts 4, 8, and 10, for which it has denied the motion for judgment of acquittal.

### i.   Counts 2–3, 5–7, 9, 11–12

The Court granted the motion for judgment of acquittal as to these counts on the grounds that the Government failed to establish that the trade secrets underlying these counts derived independent economic value from their secrecy.  *See supra* Section II.B.i.  For the same reasons as explained in that section, if the judgment of acquittal is vacated or reversed on appeal, a new trial is warranted on these counts.   The Government expressly admitted at trial that it was not showing its expert, Dr. Goetz, the CAD drawings for the trade secrets underlying these counts.  *See* Trial Tr. at 2555:1–3 (stating that the Government was going to show Dr. Goetz "some of [the CAD drawings]—not all of them, but some of them").  It also admitted that Dr. Goetz was the only source of possible testimony as to the independent economic value of the trade secrets underlying those counts.  11/10/21 Hrg. Tr. at 64:15–25.  Without any evidence on the independent economic value of the trade secrets in counts 2–3, 5–7, 9, and 11–12, the Government did not prove that trade secrets existed for those counts.  A "serious miscarriage of justice" would occur if Olgado was convicted for counts for which one element of the claim remained unproven beyond a reasonable doubt.  *Kellington*, 217 F.3d at 1097.  Accordingly, a new trial would be warranted on those counts if the judgment of acquittal is vacated or reversed on appeal.

### ii.   Counts 4, 8, and 10

The Court denied the motion for judgment of acquittal as to counts 4, 8, and 10, and thus considers Olgado's arguments for a new trial as to those counts.

#### a.   Failure to Give Olgado's Possession Instruction

Olgado first argues that he is entitled to a new trial because the Court refused to give his possession instruction, which would have required the jury to find that Olgado had "access" to the trade secrets in order to possess them.  As recounted *supra* Section II.B.iv, Olgado requested to add the following language to the Ninth Circuit Model Instruction on possession:

> Possession of a trade secret that consists of electronic information requires proof that the person had knowledge of and access to the particular electronic information.   Access to information is the capability to read, manipulate or utilize the electronic information.

ECF No. 271 at 52.  Olgado says that by failing to give this instruction, the Court failed to "have the jury instructed as to his theory of the case."  Motion at 12–13 (quoting *United States v. Johnson*, 459 F.3d 990, 993 (9th Cir. 2006)).  Olgado says the Court was required to give his instruction because it had foundation in the evidence in this case, was supported by the law, and was not adequately covered by other instructions.  *Id.* (citing *United States v. Barragan*, 871 F.3d 689, 710 (9th Cir. 2017)).  The Government argues that the Court was not required to give this instruction and that Olgado was free to argue to the jury—as he did—that he did not possess the CAD files because he could not open the 2D versions of them.  Opp. at 14–15.

The Court agrees with the Government.  To show that a new trial is warranted due to failure to give a jury instruction, Olgado must demonstrate that his instruction "(1) has some foundation in the evidence presented, (2) is supported by law, and (3) is not adequately covered by other instructions."  *Barragan*, 871 F.3d at 710.  Olgado does satisfy the first prong—his instruction does have "some foundation" in the evidence because he did not have the immediate ability to open the 2D CAD files (although he merely had to activate his NX free trial to do so).  Regardless, he cannot satisfy the next two prongs.  His instruction is not "supported by law."  Olgado's instruction would require the jury to find "access" to find possession.  Indeed, it would require the jury to find that he had the "capability to read, manipulate or utilize the electronic information."  ECF No. 271 at 52.  But this more severely narrows the definition of "possession" than is supported by case law.  *See supra* Section II.B.iv (citing *Romm*, 455 F.3d at 1000–01; *Carpegna*, 2013 WL 4442036, at *3; *AVX Corp.*, 2017 WL 11316598, at *1–3).  Additionally, his theory was "adequately covered by other instructions."  The comment to the instruction on possession that the Court gave states that the instruction is "all-inclusive" and that "there is no need to attempt to distinguish further between [issues such as] actual and constructive possession and sole and joint possession."  The Court expressly allowed Olgado to argue that because he could not access the 2D drawings using the Solid Edge software, he did not have the possession of

the trade secrets.  The instruction would have allowed the jury to agree with Olgado and acquit him on that basis, but the jury declined to do so.  Accordingly, Olgado was not entitled to his alternative instruction on possession, and a new trial is not warranted on that basis.

### b.   *Variance in Proof of Economic Value of the Trade Secrets*

Olgado then argues that the Government's evidence constituted a "fatal variance" from the Indictment because the Government used evidence regarding Applied's epitaxy and other technology to prove that the trade secrets charged in the Indictment derived independent economic value from their secrecy.  Motion at 23–25.  Olgado says that this method of proof varied from the facts alleged in the Indictment and the Bill of Particulars, which only mentioned the alleged trade secrets related to Applied's MOCVD technology.  *Id.*  The Government responds that there was no such variance because the Indictment did not limit proof of economic value to a specific set of facts.  Opp. at 23.  Even if there was a variance, the Government contends that it would be permissible because it (1) did not change the behavior for which Olgado was convicted, and (2) did not prejudice Olgado.  *Id.*

The Court finds there was no variance from the charging documents.  A variance occurs when "the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment."  *United States v. Hartz*, 458 F.3d 1011, 1020 (9th Cir. 2006).  The Indictment alleged, and the Bill of Particulars specified, the CAD drawings that were the trade secrets underlying counts 2–12 of the Indictment.  It charged Olgado with impermissibly possessing those trade secrets.  Olgado was convicted for that conduct—not for possessing different trade secrets, or for aiding and abetting another's possession of those trade secrets, or any other theory.  The Indictment importantly did not specify the Government's evidence for proving the independent economic value derived from the secrecy of the trade secrets—nor was it required to.  *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982) (Government need only allege "essential facts necessary to apprise a defendant of the crime charged," not "its theory of the case or supporting evidence").  The Indictment only stated that Applied spent "years of research and testing, and millions of dollars of investment" to develop the MOCVD tool.  Indictment ¶ 7.  Trial testimony showed that the MOCVD tool was based on

United States District Court
Northern District of California

1   Applied's epitaxy technology, which was part of that "years of research and testing." *E.g.*, Trial

2   Tr. at 886:19–887:14.  The Government's method of proving the independent economic value of

3   the trade secrets did not vary from the Indictment.

4   　　　　The cases Olgado cites are distinguishable.  In *United States v. Adamson*, the Ninth Circuit

5   reversed a conviction for wire fraud where a jury instruction "allowed the jury to convict the

6   defendant of wire fraud if it found that the defendant had misrepresented how the servers had been

7   upgraded," instead of merely "misrepresenting the fact that the servers had been upgraded," as

8   charged in the indictment.  291 F.3d 606, 615–16 (9th Cir. 2002).  This variance was fatal because

9   it "not only failed to inform the defendant of the actual misrepresentation that would be shown at

10  trial, but also affirmatively misled the defendant and obstructed his defense at trial."  *Id.* at 616.

11  Similarly, in *United States v. Choy*, the Ninth Circuit found a fatal variance where the defendant

12  was convicted of giving $5,000 to a private person and therefore "indirectly conferr[ing] value . . .

13  on a public official," even though the indictment charged him with giving $5,000 directly to a

14  public official.  309 F.3d 602, 607 (9th Cir. 2002).  Here, in contrast, the behavior for which

15  Olgado was convicted—possession of stolen trade secrets specified in counts 4, 8, and 10—was

16  exactly the same as that charged in counts 4, 8, and 10 of the Indictment.

17  　　　　Accordingly, the theory on which Olgado was convicted was not a fatal variance from that

18  charged in the Indictment.  The Court thus need not reach the Government's alternative arguments

19  that a variance neither went to Olgado's behavior nor prejudiced him.

20  　　　　　　　*c.  Whether the Evidence Preponderates Sufficiently Heavily Against the Verdict*

21  　　　　Finally, the Court independently evaluates whether "the evidence preponderates

22  sufficiently heavily against the verdict," notwithstanding the "abstract sufficiency" of the

23  evidence, *Kellington*, 217 F.3d at 1097, and whether the "cumulative effect" of any errors requires

24  a new trial "in the interests of justice."  *See United States v. Bordewick*, 2008 WL 4058665, at *4,

25  *6 (N.D. Cal. Aug. 27, 2008); Motion at 9.

26  　　　　The Court does have some misgivings about the outcome of this case.  The Court entered a

27  judgment of acquittal for two of Olgado's codefendants on the counts for which Olgado was

28  convicted.  The jury acquitted Olgado's codefendant Chen of those same counts, acquitted two of

1    Olgado's codefendants of conspiracy, and hung on that count as to Olgado and Chen.  Under the

2    jury's verdict, Olgado is the only charged member of the Indictment found guilty in this case.

3    This is despite him not initiating the startup that led to his conviction—the person who did so

4    having been acquitted by the same jury that convicted Olgado.  Defense counsel argued that the

5    Government tried a conspiracy case—a scheme to steal trade secrets—and along with that primary

6    thrust also submitted evidence of theft of 11 individual trade secrets.  11/10/21 Hrg. Tr. at 12:17–

7    13:18.  As the Court commented at the hearing, "This is not how anyone would have imagined this

8    case would turn out . . . when opening statements were made."  *Id.* at 13:19–14:2.

9         Nevertheless, that does not mean there is a defect in the verdict.  *Id.*  The Court has

10   carefully evaluated each of Olgado's arguments as to why the jury's verdict on these counts was

11   defective and why a new trial is warranted, and it has rejected all of them as to these three counts.

12   There was sufficient evidence to find that the Government proved that Olgado possessed stolen

13   trade secrets in counts 4, 8, and 10.  Given the sufficiency of the evidence and the lack of any

14   identified defect, the Court's observations about the unexpected verdict do not reach the level of a

15   "serious miscarriage of justice" that would warrant a new trial on counts 4, 8, and 10.

16   **IV.   ORDER**

17        For the foregoing reasons, IT IS HEREBY ORDERED that:

18   - Olgado's motion for judgment of acquittal is GRANTED as to counts 2–3, 5–7, 9, and

19        11–12 of the Indictment;

20   - Olgado's motion for judgment of acquittal is DENIED as to counts 4, 8, and 10 of the

21        Indictment;

22   - Olgado's motion for a new trial is CONDITIONALLY GRANTED on counts 2–3, 5–

23        7, 9, and 11–12 of the Indictment, pursuant to Federal Rule of Criminal Procedure

24        29(d)(1); and

25   - Olgado's motion for a new trial is DENIED as to counts 4, 8, and 10.

26   Dated:  January 6, 2022

27   _____

28   BETH LABSON FREEMAN
     United States District Judge

United States District Court
Northern District of California