UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>DONALD OLGADO,<br>Defendant. | Case No. 17-cr-00603-BLF-2<br><br>**ORDER GRANTING GOVERNMENT'S MOTION FOR RECONSIDERATION; GRANTING OLGADO'S MOTION FOR RECONSIDERATION**<br><br>[Re: ECF No. 421-1, 425-2] |

In a January 6, 2022 order, the Court found that the trial evidence was insufficient to permit a reasonable juror to convict Defendant Donald Olgado on counts 2–3, 5–7, 9, and 11–12 of the Indictment, but that there was sufficient evidence to permit a rational juror to convict him on counts 4, 8, and 10. The Court thus granted Olgado's motion for judgment of acquittal (and conditionally granted his motion for a new trial) on counts 2–3, 5–7, 9, and 11–12, but denied the motions for counts 4, 8, and 10.

Before the Court are two motions for reconsideration of that Order. The Government urges the Court to reconsider its ruling that a pretrial order required the Government to elicit expert testimony (as opposed to lay testimony or other evidence) to prove that the charged trade secrets derived independent economic value from their secrecy, which the Government failed to do for the trade secrets underlying counts 2–3, 5–7, 9, and 11–12. ECF No. 421-1 ("GRecon"); *see also* ECF No. 434 ("GReply"). Olgado opposes that motion. *See* ECF No. 432 ("DOpp."). Separately, Olgado urges the Court to reconsider its ruling that there was sufficient evidence to convict him on counts 4, 8, and 10 under the theory that he "converted without authorization" the trade secrets underlying those counts under a demand-and-refusal theory of conversion. *See* ECF

No. 425-2 ("DRecon"); *see also* ECF No. 435 ("DReply"); ECF No. 457 ("DSupp."). The Government opposes Olgado's motion. *See* ECF No. 433 ("GOpp."); ECF No. 455-1 ("GSupp."). In light of Olgado's motion for reconsideration, the Government also asks the Court to reconsider its ruling that the Government failed to prove Olgado "appropriated, obtained, or converted" the trade secrets "without authorization" under § 1832(a)(3). *See* GOpp. at 19. The Court held a hearing on the motions on May 27, 2022. ECF No. 450.

On reconsideration, the Court finds that it erred in three portions of its prior order. After evaluating the Government's motion for reconsideration, the Court finds that its pretrial order did not restrict the Government to expert testimony on the issue of whether the trade secrets derived independent economic value from their secrecy. Considering the evidence to which the Government now points, the Court finds that there was sufficient evidence of independent economic value to support the jury verdict on each of counts 2–12. After evaluating Olgado's motion for reconsideration, the Court further concludes that it erred in sustaining Olgado's conviction on the basis that he "converted without authorization" the trade secrets on a "demand-and-refusal" theory of conversion. The Government never presented that theory to the jury, so the jury could not have convicted Olgado on that basis. Finally, the Court determines that it erred in the portion of its order finding that evidence that Olgado downloaded files from Applied's Teamcenter database to his personal external storage devices during his employment in violation of Applied's internal policies, but without evidence that Olgado used or disclosed those trade secrets, did not meet the statutory requirement that he "appropriated, obtained, or converted without authorization" the trade secrets within the meaning of § 1832(a)(3).

The Government's motion for reconsideration is thus GRANTED, and Olgado's motion for reconsideration is GRANTED. The Court withdraws Sections II.B.i, II.B.vi.a, and II.B.vi.b of its prior order. In light of these rulings, Olgado's motion for judgment of acquittal is DENIED as to counts 2–12 and his motion for a new trial on those counts is DENIED.

**I. BACKGROUND**

In the Indictment, the Government charged Defendant Donald Olgado and three codefendants with one count of conspiracy to commit theft of trade secrets, 18 U.S.C.

1   § 1832(a)(5), and eleven counts of possession of stolen trade secrets and aiding and abetting such
2   theft and possession, 18 U.S.C. §§ 1832(a)(3) & 2. ECF No. 1 ("Indictment") ¶¶ 11–20. Olgado
3   and his three codefendants were employees of Applied Materials, Inc., which supplied equipment,
4   services, and software to enable the manufacturing of semiconductor chips for electronics, flat
5   panel displays for computers, smartphones, and televisions, and solar products. *Id.* ¶¶ 1–5. The
6   technology at issue in the Indictment supported the high-volume manufacturing of semiconductor
7   wafers to be used in lighting and electronic devices, such as flatscreen televisions and
8   smartphones. *Id.* ¶ 6. As described in the Indictment, Applied developed a multichamber, high-
9   yield wafer capacity system for Metal Organic Chemical Vapor Deposition ("MOCVD"), a
10  "highly complex process for growing crystalline layers by spraying different chemicals on
11  wafers." *Id.* ¶ 7. The Government alleged that MOCVD technology involved multiple trade
12  secrets, which Applied sought to protect by housing relevant materials in a confidential database
13  called Teamcenter, which could only be accessed by authorized individuals. The Indictment
14  alleged that Olgado and his codefendants engaged in a conspiracy to steal Applied's technology
15  and use it in a competing company called Envision. *Id.* ¶ 13. The conspiracy—charged in count 1
16  of the Indictment—allegedly lasted from September 2012 through approximately December 2012
17  and involved illegal possession of eleven specified Applied trade secrets in the form of CAD
18  drawings, each one the foundation of one of counts 2–12 of the Indictment. *Id.* ¶ 20.

19  A jury trial commenced on July 27, 2021 and lasted until the Government closed its
20  rebuttal case on August 17, 2021. At the close of the evidence, the Court granted motions for
21  judgment of acquittal brought by two of Olgado's codefendants as to the eleven counts for aiding
22  and abetting possession of stolen trade secrets; all other counts (including all counts against
23  Olgado) proceeded to the jury. The jury delivered its verdict on August 24, 2021. As to Olgado,
24  the jury hung on the count of conspiracy to commit theft of trade secrets and convicted him on the
25  eleven counts of possession of stolen trade secrets.[1] ECF No. 378.

---

27  [1] The Government dismissed the conspiracy count after the Court declared a mistrial on that count.
28  ECF No. 386. The jury acquitted Olgado's codefendant Liang Chen of counts 2–12 and acquitted

1    On January 6, 2022, the Court granted in part and denied in part Olgado's motion for
2   judgment of acquittal.  ECF No. 415 ("January 6 Order" or "Ord.").  The Court granted Olgado's
3   motion as to counts 2–3, 5–7, 9, and 11–12 (and conditionally granted his motion for a new trial
4   on those counts) on the basis that one of its pretrial orders required the Government to present
5   expert testimony on the issue of whether the trade secrets derived independent economic value
6   from their secrecy, but the Government's expert specifically testified only as to counts 4, 8, and
7   10.  *See id.* at 3–7.  As to counts 4, 8, and 10, the Court agreed with Olgado that his conviction
8   could not be sustained on the basis that he "obtained without authorization" or "appropriated
9   without authorization" the trade secrets when he downloaded them from Teamcenter while he was
10  an employee, even if it was in violation of Applied's internal policies.  *See id.* at 19–23.
11  Nevertheless, the Court found that the convictions on counts 4, 8, and 10 could be sustained
12  because Olgado "converted without authorization" those trade secrets on a demand-and-refusal
13  theory by failing to return the MOCVD files after a December 7, 2012 meeting with an Applied
14  employee in which Olgado falsely claimed that that he had not taken any of Applied's confidential
15  information to his home.  *Id.* at 23–24.
16   Both the Government and Olgado filed motions for reconsideration of the Court's January
17  6, 2021 order.  *See* GRecon, DRecon.

## II.  GOVERNMENT'S MOTION FOR RECONSIDERATION

19   The Government urges the Court to reconsider its ruling that a pretrial order required the
20  Government to elicit expert testimony to prove that the trade secrets derived independent
21  economic value from their secrecy.  GRecon at 2–6.  The Government says that the Court's
22  motion *in limine* order did not require it to do so, and that the Government never took that
23  position.  *Id.* at 6–9.  The Government points to what it says is sufficient evidence (lay and expert)
24  supporting a jury finding of independent economic value.  *Id.* at 9–15.  Olgado argues that the
25  Court's pretrial order did require expert testimony on this issue, which was within the Court's
26  discretion.  DOpp. at 3–7.  Olgado says that reversing this order would prejudice him, that the

---

28  Olgado's codefendants Wei-Yung Hsu and Robert Ewald of count 1.  ECF No. 378.

4

1  Government is estopped from contesting error on this topic, and that in any case the lay and expert
2  evidence the Government points to is insufficient. *Id.* at 7–20.

3  After considering the parties' arguments, the Court concludes that it erred in its January 6
4  Order when it stated that the Government was required to prove independent economic value from
5  secrecy solely with expert testimony. The parties agree that expert testimony is not required *in*
6  *every case* to prove that trade secrets derive independent economic value from their secrecy. *See*
7  GRecon at 3–5 (citing, *inter alia*, *United States v. Chung*, 659 F.3d 815, 826 (9th Cir. 2011));
8  DOpp. at 3–4 (citing, *inter alia*, *Alifax Holding SPA v. Alcor Sci. Inc.*, 2019 WL 13091790, at *7
9  (D.R.I. Mar. 26, 2019) (whether expert testimony needed to show existence of a trade secret is
10 determined "on a case-by-case basis, like any other case arising under any other area of law"));
11 *accord, e.g.*, *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 110 (3d Cir. 2010) (affirming
12 order granting preliminary injunction where district court found that recipe for English muffins
13 was a trade secret without relying on expert testimony).

14 Although the Court had the discretion to require the Government to prove the existence of
15 a trade secret through expert evidence, the Court finds that imposing that requirement
16 mischaracterizes its pretrial order on the motions *in limine*. The Court's motions *in limine* order
17 precluded the Government (based on its own concession) from "ask[ing] witnesses to opine
18 whether information is or is not a trade secret." *See* ECF No. 291 at 15–16 (citing ECF No. 276 at
19 2 (Government concession)). But opining on whether information "is or is not a trade secret"—an
20 ultimate issue for counts 2–12—is not the same as providing testimony from which a jury may
21 conclude that the information derives independent economic value from being secret, which is one
22 of the elements of the existence of a trade secret. *See* 18 U.S.C. § 1839(3); *Chung*, 659 F.3d at
23 824–25; ECF No. 375 ("Jury Inst.") No. 35. The Court's pretrial order does not speak to whether
24 expert testimony was required on that element, so the January 6 Order erred in imposing that
25 requirement on the basis of the pretrial order.

26 The Court thus must look more broadly at the trial evidence to determine if there was
27 sufficient evidence for a rational juror to conclude that the drawings derived independent
28 economic value from their secrecy. When determining whether information derives independent

economic value from being kept secret, "courts most often consider the degree to which the secret information confers a competitive advantage on its owner." *See Chung*, 659 F.3d at 826 (citing *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993)).  Courts also look to the cost and the effort to develop the secret information." *Id.* (citing *Beard Res., Inc. v. Kates*, 8 A.3d 573, 594 (Del. Ch. 2010)).  But the "analysis is fact-intensive and will vary from case to case." *Id.*  The evidence here (both lay and expert) to which the Government now points was sufficient for a rational juror to conclude that the trade secrets derived independent economic value from their secrecy.  First, when Olgado's codefendant Dr. Chen sought to acquire rights to the technology, he offered to pay Applied Materials $6–8 million to license the NLighten technology, which included that intellectual property associated with the MOCVD tool with an approximate value of $2 million.  Trial Tr. 299:11–19, 396:1–4.  Second, multiple Applied executives testified that they still saw the technology as highly valuable, even if the NLighten tool itself wasn't being pursued further, and worth even more than what Dr. Chen was offering.  *See, e.g., id.* 886:19–887:25 (Dickerson:  Applied viewed underlying technology as "incredibly valuable" because Applied "us[ed] a lot of those core technologies in other markets"); *id.* 548:3–22 (Splinter:  Dr. Chen's offer of $6–8 million for the MOCVD technology was "dramatically too low . . . because there was significant I.P. and the possibility that [they] could use it later within Applied Materials" and risks from having "I.P. flow out of the company"); *id.* 336:21–337:6 (Pinto:  Dr. Chen's proposal was monetarily "inadequate" and "had to be over [$]10 million and be multiple digits" to have "any kind of substantive chance" at winning over Applied executives).  Third, Burrows and other Applied engineers testified about the time and effort that Applied devoted to developing the NLighten tool and the individual parts comprising the charged trade secrets.  *See, e.g.*, Trial Tr. 2193:3–12 (showerhead (count 4) took "maybe a year and a half, maybe two years" to develop); *id.* 2200:17–2201:7 (gas deflector (count 5) took one and a half to two years to develop); *id.* 2219:11–19 (hydride pallet (count 10) took eight to twelve months to develop).  Finally, after Applied concluded that it would not license the MOCVD IP, Olgado downloaded 98% of the CAD drawings through methods that violated Applied's policies and circumvented certain access restrictions, indicating that he saw great value in the files as a "stable

base" from which to build a tool. Trial Tr. 2007:24–2008:21, 2239:18–25; TRX 145A. All of this evidence together was sufficient for a rational juror to conclude that the charged trade secrets derived independent economic value from their secrecy.

Olgado's remaining arguments to the contrary are not persuasive. First, Olgado argues that "reversing the Court's decision" would prejudice Olgado because he relied on the Court's pretrial order, which is now law of the case. DOpp. at 7–9. But as the Court has found, its pretrial order did not in fact impose a limitation on the type of evidence the Government could use to prove independent economic value from secrecy. That limitation is thus not law of the case, and Olgado cannot suffer prejudice from "reversing" a ruling that did not in fact occur.

And second, Olgado argues that the Government is estopped from contesting error on this topic because the prosecutor agreed at the Rule 29 hearing that the Court had previously limited the issue of independent economic value to expert testimony. *Id.* at 9–14. The Court, however, will not hold the prosecutor to that representation, if it was in fact made. Olgado had not raised the issue of failure of proof of independent economic value in his Rule 29 motion, so the Court's *sua sponte* inquiry about the issue at the hearing was not an issue on which the parties had previously presented argument. Additionally, it is not clear from the hearing transcript that the prosecutor in fact made that concession. In response to an initial question from the Court about the *in limine* order, the prosecutor stated that she believed that order "went to the conspiracy count" and that the Government was "very careful to ensure that Mr. Burrows testified only about each of the counts in 2 through 12." R29 Tr. 57:16–22. The prosecutor further noted that Burrows "testified for hours about each of the drawings, and how important they were to the tool," going through "the research and development, their function, the importance of each one." *Id.* 57:6–11. In the Court's next colloquy with the prosecutor, the prosecutor and the Court interchangeably characterized the "ultimate issue" that could not be opined on as either "the opinion of whether [a drawing] was a trade secret," *id.* 58:9–13, or "whether [a drawing] derived independent economic value from being secret," *id.* 58:25–56:3. But those issues, as already discussed, are not the same. Given the lack of clarity in the exchange, this purported concession is not a basis on which to reaffirm the Court's prior ruling on this issue.

7

For those reasons, the Government's motion for reconsideration is GRANTED, and the Court withdraws Section II.B.i of its January 6 Order that found that there was not sufficient evidence for a rational juror to conclude that the trade secrets charged in counts 2–3, 5–7, 9, and 11–12 derived independent economic value from their secrecy and substitutes this finding that substantial evidence supported this element of the jury's verdict. With that portion of the January 6 Order withdrawn, the remainder of the Court's analysis in the January 6 Order (and this Order) now applies to all of counts 2–12.

### III. OLGADO'S MOTION FOR RECONSIDERATION

#### A. Demand-and-Refusal Theory of Conversion Not Presented at Trial

Olgado urges the Court to reconsider its ruling that his conviction can be sustained on the basis that he "converted without authorization" the trade secrets when he failed to return the MOCVD files after a December 7, 2012 meeting with an Applied employee in which Olgado falsely claimed that that he had not taken any of Applied's confidential information to his home. *See* Ord. at 23–24. Olgado says the Court's construction of conversion was clear error, and that even if it was correct, the demand-and-refusal theory was never presented to the jury. *See generally* DRecon. The Government essentially concedes that this theory of conversion was not presented, instead contending that the convictions should be upheld because Olgado "appropriated, obtained, or converted without authorization" the trade secrets when he downloaded tens of thousands of CAD drawings from Teamcenter to his personal external storage device and without confidentiality labeling in violation of Applied's internal policies. GOpp. at 11–16, 19–25.

After considering the parties' arguments, the Court concludes that it erred by sustaining the convictions based on the demand-and-refusal theory of conversion. The Court need not consider if its construction of the term "conversion" was in error because it concludes that the Government never presented the theory to the jury. Courts reviewing the sufficiency of the Government's evidence at trial cannot affirm a conviction "on a different theory than was ever presented to the jury." *McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991); *United States v. Yates*, 16 F.4th 256, 265 (9th Cir. 2021). The Government did elicit testimony from Applied employee Stephen

8

1    Adams about the December 7, 2012 meeting and discussed that testimony in its opening statement
2    and closing arguments. *See* Trial Tr. 2124:20–2130:2, 3704:16–25. The theory of liability that
3    the Government presented to the jury, however, was that Olgado acted "without authorization"
4    when he downloaded tens of thousands of files from Teamcenter in violation of Applied's internal
5    policies, even if he did not ultimately disclose them or put them to use after the downloads. This
6    is evident in both the Government's opening statement and closing argument to the jury. The
7    Government focused on Olgado's efforts to circumvent Applied's policies regarding removable
8    storage devices and the volume of the downloaded files. *See* Trial Tr. 220:25–222:3 (opening
9    statement: Olgado "discussing downloading of files onto a USB drive," pursuing a USB
10   exception request, and telling other engineers to download files); *id.* at 3702:18–20, 3703:4–8,
11   3704:25–3705:13 (closing argument: Olgado "downloaded thousands of the NLighten drawings"
12   and bills of materials, "talked about how he was bypassing Applied's security restrictions," and
13   discussed "the difficulties he encountered at the time [and] the progress he was making in
14   downloading the information"). Indeed, the Government essentially concedes that it did not
15   present the demand-and-refusal theory of conversion to the jury. *See* GOpp. at 19 ("To be sure,
16   the [G]overnment did not specifically argue that even if Olgado lawfully came into possession of
17   the CAD drawings, his failure to return them promptly after the implicit demand during h[is]
18   interview with Adams on December 7, 2012, effected a conversion."). The convictions
19   accordingly cannot be sustained on this basis.

**B.    Sufficient Evidence Supports the Finding That Olgado "Obtained" or "Appropriated" the Trade Secrets "Without Authorization"**

22   Without the demand-and-refusal theory to sustain the convictions, the Government argues
23   in opposition to Olgado's motion that the Court erred in rejecting its trial theory that Olgado
24   "appropriated, obtained, or converted without authorization" the trade secrets when he bulk
25   downloaded the Teamcenter files in violation of Applied's internal policies.[2] *See* GOpp. at 11–16,

---

[2] Olgado argues that the Government has not met the standard for seeking reconsideration on this issue, DReply at 7–8, but the Court will consider the Government's arguments because it has now removed the existing basis for sustaining the convictions and Olgado has had ample opportunity to thoroughly brief and argue this issue.

9

19–25; GSupp. at 1–5. Olgado argues that the Court's rejection of this theory in its January 6 Order was correct. *See* DReply at 8–10; DSupp. at 1–3. After thoroughly considering the parties' arguments on this issue from both the initial Rule 29 and reconsideration briefing and hearings, the Court finds that it erred in the January 6 Order when it concluded that Olgado did not "appropriate[], obtain[], or convert[] without authorization" the trade secrets under § 1832(a)(3) when he downloaded Teamcenter files to his personal external storage device and without confidentiality labeling in violation of Applied's internal policies, even without any evidence that he disclosed or put them to use after he downloaded them.

In order to properly reconsider this issue, it is helpful to start at the beginning. Olgado was indicted and convicted on 11 counts of trade secret theft in violation of 18 U.S.C. § 1832(a)(3), which provides:

> (a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly . . .
>
> (3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization; . . .
>
> shall, except as provided in subsection (b), be fined under this title or imprisoned not more than 10 years, or both.

Without objection relevant here, *see* ECF No. 320-2 at 15–18 (joint proposed jury instruction with single irrelevant dispute), the jury was instructed as follows:

> **JURY INSTRUCTION NO. 40**
> **POSSESSION OF STOLEN TRADE SECRETS**
>
> The defendants are charged in Counts Two through Twelve with unlawful possession of trade secrets in violation of Section 1832(a)(3) of Title 18 of the United States Code. In order for you to find any defendant guilty on any of these counts, you must find with respect to that defendant that the government has proved each of the following elements beyond a reasonable doubt:
>
> 1. The item alleged in each count was a trade secret, as I have defined that term for you. The trade secrets alleged for each count are as follows: [list of charged trade secrets]
>
> 2. The defendant knew that (a) the item alleged in each count was

        actually secret because it is neither known to nor readily ascertainable through proper means by another person who can obtain economic value from the disclosure of the information, (b) the owner had taken reasonable measures to keep such information secret; and (c) the information derived independent economic value, actual or potential, from being secret.

3. The defendant knowingly received or possessed the trade secret on or after November 30, 2012, knowing the same to have been stolen or appropriated without authorization, obtained without authorization, or converted without authorization;

4. The defendant intended to convert the trade secret to the economic benefit of anyone other than the owner of the trade secret;

5. The defendant knew or intended that his conduct would injure the owned of the trade secret; and

6. The trade secret was related to a product or service used in or intended for use in interstate or foreign commerce.

Jury Inst. No. 40.

      Reconsideration focuses on element 3 of the jury instruction, which tracks § 1832(a)(3). In its January 6 Order, the Court focused too much on the meaning of "without authorization" and relied on Computer Fraud and Abuse Act ("CFAA") cases that evaluate whether "access" was "without authorization." That was mistaken. As the Court previously noted, the definition of "without authorization" is not actually ambiguous or in dispute. *See* Ord. at 20. The phrase is "not foreign to Congress or the courts," as "the terms 'authorize,' 'authorized' or 'authorization' are used without definition over 400 times in Title 18." *United States v. Nosal*, 844 F.3d 1024, 1035 (9th Cir. 2016) ("*Nosal II*"). Because there is no indication Congress intended a different definition here than in other statutes, the Court applies the term's "ordinary, contemporary, common meaning" approved by the Ninth Circuit in cases under the CFAA: without "permission or power granted by an authority." *See LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009) (construing term in CFAA).

      Instead, as the Government points out, the Court must consider whether the trade secrets were "obtained" or "appropriated" "without authorization" when Olgado downloaded Teamcenter files to his personal external storage device and without confidentiality labeling in violation of Applied's internal policies, but without evidence that he ever disclosed them or put them to use.

11

There is a dearth of case law on this question. The only guidance from the Ninth Circuit comes in a footnote from *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012) ("*Nosal I*"), a CFAA case. There, the Ninth Circuit rejected the government's expansive interpretation of the CFAA, holding that "if Congress meant to expand the scope of criminal liability [under the CFAA] to everyone who uses a computer in violation of computer use restrictions—which may well include everyone who uses a computer—we would expect it to use language better suited to that purpose." *Id.* In a footnote at the end of that sentence, the court stated, "Congress did just that in the federal trade secrets statute—18 U.S.C. § 1832—where it used the common law terms for misappropriation, including 'with intent to convert,' 'steals,' 'appropriates,' and 'takes.'" *Id.* at 857 n.1. The Ninth Circuit thus indicated that that the actions criminalized by § 1832 are broader than the actions criminalized by the CFAA because while the CFAA is "an anti-hacking statute," *id.* at 857, section 1832 uses broader misappropriation language. *See id.* at 856–57. Other than this single statement, the parties have not identified (and the Court is unaware of) any additional guidance from the Ninth Circuit on the scope of § 1832 in this context.

Here, the Government offered evidence at trial that when Olgado downloaded the trade secrets from Teamcenter, he violated Applied's internal policies by evading restrictions on use of external storage devices, bulk downloading tens of thousands of files to a personal external storage device once he got around restrictions, and failing to maintain confidentiality labeling on the files, all for the benefit of Envision, a different company he and his three codefendants sought to start. The Government did not offer evidence that after downloading the files, Olgado ever disclosed the trade secrets or put any of the charged trade secrets to any use. The question in this case becomes whether § 1832(a)(3) criminalizes that conduct.

After evaluating the parties' arguments on reconsideration, the Court finds it erred when it concluded in its prior ruling that § 1832(a)(3) does not encompass that conduct. The Court concludes that, viewed in the light most favorable to the verdict, the evidence supported a finding that Olgado "obtained" or "appropriated" the trade secrets "without authorization."[3]

---

[3] The Court thus need not consider whether Olgado "converted" the trade secrets without authorization.

12

### i. "Obtained . . . Without Authorization"

Section 1832(a)(3) criminalizes possession of trade secrets that were "obtained . . . without authorization." The Court's January 6 Order correctly noted that "obtained" is not defined in the statute and applied the ordinary meaning of the term: "to bring into one's possession." *See* Ord. at 21 (citing Obtain, Black's Law Dictionary (11th ed. 2019)).

The Court finds that it erred when it concluded that there was not sufficient evidence to find that Olgado "obtained" the trade secrets without authorization. The Court's analysis focused on the fact that Olgado was "granted access to Teamcenter" as an Applied employee. But the ordinary meaning of "obtain" is "*to bring into* one's possession." As the Government urges, *see* GOpp. at 22, evidence of the means of acquiring the trade secrets, not just the fact that access to them is permitted, is relevant to the question of how one "obtains" the trade secrets or, in other words, how an employee "bring[s] into" their possession the trade secrets.

With this definition in mind and viewing the evidence in the light most favorable to the verdict, there was sufficient evidence that Olgado "obtained . . . without authorization" the charged trade secrets. While Olgado acquired the files from Teamcenter as an employee authorized to access that database, the Government elicited extensive evidence that Olgado sought to hide the means through which he acquired the files because he knew that it violated Applied's rules and that he was acting for the benefit of Envision. Olgado expressed concerns about "the paper trail and conflict of interest with [Applied]" and stated that he "need[ed] to be careful" when downloading files. TRX 102. When he tried to download files, he said the process was "[v]ery painful." *Id.*; TRC 109C. When Applied's security measures initially prevented Olgado from downloading the files to external storage, Olgado said he needed to "get some hackers" to get around the restrictions. TRX 116B. Olgado asked Dr. Chen to approve an exception request, but there is no evidence that it was ever granted. Trial Tr. 2022:7–14, 2024:16–24; TRX 379. Olgado himself eventually succeeded in getting around the restrictions, calling Applied "pathetic" and offering to pull additional information if Dr. Chen, Hsu, or Ewald needed it. TRX 131A. He then downloaded tens of thousands of CAD drawings, many without the confidentiality labeling that Applied's policies required. *See* TRX 68-10, TRX 315-3. Applied's internal policies limited the

13

way employees could "bring into" their possession the trade secrets, and Olgado knowingly evaded and violated those policies against bulk downloads to external storage devices and without confidentiality labeling. This evidence, viewed in the light most favorable to the verdict, was sufficient to support a finding that he "obtained . . . without authorization" the trade secrets.

### ii. "Appropriated . . . Without Authorization"

The Court also finds that Olgado "appropriated . . . without authorization" the trade secrets under § 1832(a)(3). Although the term "appropriated" is not defined in the statute, the statute does define the term "misappropriation," which is instructive on the meaning of "appropriated." The term "misappropriation" is defined to include actions falling under two umbrellas. *See* 18 U.S.C. § 1839(5).

#### a. "Acquired by Improper Means"

The first form of misappropriation is the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *See* 18 U.S.C. § 1839(5)(A). The statute further specifies that "improper means" "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" that "does not include reverse engineering, independent derivation, or any other lawful means of acquisition." *Id.* § 1839(6)(A). The Government contends that Olgado acquired the trade secrets "through improper means" because (1) Applied's internal restrictions (which Olgado evaded) prohibited Olgado from making bulk downloads to an external storage device, required confidentiality labels that Olgado did not use, and limited Olgado's access to the purpose of his work responsibilities at Applied, and (2) because the volume and timing of Olgado's downloads allowed the jury to infer improper means. *See* GOpp. at 23.

Taking the evidence in the light most favorable to the verdict, the Court finds that the evidence to which the Government points also fits within this statutory definition. Although no evidence suggests that Olgado committed theft, bribery, or espionage, or made affirmative misrepresentations to obtain the trade secrets, the same evidence cited above was sufficient to conclude that Olgado acquired the trade secrets by "breaching a duty to maintain secrecy."

14

Olgado violated Applied's internal policies regarding confidentiality and handling of trade secret files stored in Teamcenter and knew that he was doing so for the benefit of Envision.

In an attempt to rebut the Government's argument, Olgado cites cases involving civil trade secrets law finding that acquisition of trade secrets by an employee authorized to access them did not amount to acquisition by "improper means." *See* Reply at 9. The cases that Olgado cites do not involve criminal cases brought under § 1832. The Government persuasively argues why each of the four cases is inapposite here. In *Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396 (S.D.N.Y. 2021), the Court granted a motion to dismiss a civil trade secrets claim under the Defend Trade Secrets Act ("DTSA") on the grounds that Zurich failed to allege that a former paralegal misappropriated its trade secrets when he allegedly forwarded confidential company materials to his personal email account, and then following his termination "threaten[ed] to keep" the trade secrets unless the company entered into a favorable settlement with him. *Id.* at 399–401. In relevant part, the court found that "merely threatening to keep trade secrets, without threatening to use or disclose them, does not give rise to a DTSA claim." *Id.* at 405. The court found that because the paralegal was "authorized to acquire this information as part of his job, . . . he did not acquire it by improper means" within the meaning of § 1839(5)(A). *Id.* But as the Government states, there are additional facts in this case that were not present in *Zurich*. Although Olgado too was "authorized" to acquire the Teamcenter information as an employee, he also engaged in a method of acquisition that bypassed Applied's own internal restrictions on that information. There was no indication in *Zurich* that the paralegal evaded any restrictions that Zurich placed on accessing or downloading that information. In contrast, the Court has already recounted the extensive evidence elicited by the Government that showed Olgado's evasion of restrictions on bulk downloading Teamcenter files to external storage and without confidentiality labeling. These additional actions, independent of an employee's authorization to acquire information, amount to acquisition by "improper means."

In the second case cited by Olgado, *Agilysys Inc. v. Hall*, 258 F. Supp. 3d 1331 (N.D. Ga. 2017), the court considered the case of a former employee who emailed Agilysys information to his personal email account and, after transferring to another company, emailed proposals to

15

Agilysys customers. *Id.* at 1338. The court found that the employee did not "acquire the information by improper means" because he was an employee authorized "to access Agilysys's trade secrets," but allowed a DTSA misappropriation claim to proceed on the basis that defendant "knew he had acquired the trade secrets improperly" in violation of a non-disclosure agreement. *Id.* at 1346. Here, Olgado did not "acquire the information by improper means" merely because he was an employee of Applied. He acquired the information by improper means because he evaded Applied's internal restrictions on downloading that information and, like the employee in *Hall*, knew he was doing so in violation of Applied's restrictions for the benefit of Envision.

The other cases Olgado cites are similarly distinguishable. Although the Court in *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 675, 681 (E.D. Pa. 2018), dismissed a claim for "procuring information by improper means" as to a defendant who "procured information while [she was] employed" with the company because she was "authorized to procure the information," the court allowed a DTSA claim to proceed against the same defendant who connected external storage to her work laptop and uploaded trade secret data to her personal drive. Olgado took similar actions here, as the Court has recounted. And in *Lifesize, Inc. v. Chimene*, 2017 WL 1532609 (W.D. Tex. Apr. 26, 2017), while the court found that defendant did not acquire trade secrets by "improper means" where his "initial access to the trade secrets at issue . . . were by permission of his employer," there was no evidence that the employee evaded any internal policies or restrictions to obtain the trade secrets. Although these cases stand for the general principle that simple acquisition of a company's trade secrets by an employee is not acquisition "by improper means," they do not compel the conclusion that violation of internal policies constraining an employee's access also does not amount to acquisition by "improper means."

    b. "Disclosure or Use"

The second umbrella of actions within the statutory definition of "misappropriation" requires the "disclosure or use of a trade secret." *See* 18 U.S.C. § 1839(5)(B). Because the Court finds that there was sufficient evidence that Olgado acquired the trade secrets through "improper means," it need not consider this umbrella of misappropriation or the Government's arguments that Olgado "used" the trade secrets by downloading them to a personal laptop that he was using

16

for Envision.  *See* GSupp. at 2–3.  But the existence of this separate umbrella of actions illustrates an important point:  while this second type of "misappropriation" uses the phrase "disclosure or use of a trade secret," the first type does not.  *Compare* § 1839(5)(A) *with* § 1839(5)(B).  This reinforces the conclusion that the actions covered by § 1839(5)(A)—a distinct definition of misappropriation—do not require use or disclosure of a trade secret and instead merely involve the means of acquiring the trade secrets.

The Court thus holds that viewing the evidence in the light most favorable to the verdict, the evidence also supported a finding that Olgado "appropriated . . . without authorization" the trade secrets when he violated Applied's internal policies regarding downloading files from Teamcenter to external storage and without confidentiality labeling for the benefit of Envision.

\*       \*       \*

Accordingly, Olgado's motion for reconsideration is GRANTED, and the Court withdraws Section II.B.vi.b of its January 6 Order that found that his convictions could be sustained because he "converted without authorization" the charged trade secrets on the basis of a demand-and-refusal theory of conversion.  The Court also withdraws Section II.B.vi.a of its January 6 Order that Olgado's convictions cannot be sustained on the basis that he "appropriated [or] obtained . . . without authorization" the trade secrets when he downloaded Teamcenter files to external storage in violation of Applied's internal policies.

### IV.  ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that the Government's motion for reconsideration is GRANTED, and the Court withdraws Section II.B.i of its January 6 Order finding that there was insufficient evidence for a rational juror to conclude that the charged trade secrets derived independent economic value from their secrecy.

It is FURTHER ORDERED that Olgado's motion for reconsideration is GRANTED, and the Court withdraws Section II.B.vi.b of its January 6 Order concluding that his convictions could be sustained because he "converted without authorization" the charged trade secrets on the basis of a demand-and-refusal theory of conversion.  The Court also withdraws Section II.B.vi.a of its January 6 Order finding that Olgado did not "appropriate[] [or] obtain[] . . . without authorization"

17

the trade secrets within the meaning of § 1832(a)(3) when he downloaded files from Applied Materials' Teamcenter database during his employment in violation of Applied's internal policies.

In light of these rulings and the remainder of the Court's January 6 Order, Olgado's motion for judgment of acquittal is DENIED as to counts 2–12 and his motion for a new trial on those counts is DENIED. Olgado's sentencing remains scheduled for September 6, 2022 at 9:00 a.m.

Dated: June 30, 2022

_____
BETH LABSON FREEMAN
United States District Judge